UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JUN 10 PM 1: 02

CLERK
BY_____
DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 2:18-cr-00008 |
| ) | |
| SUSAN MATEO ) | |

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**
(Doc. 89)

Defendant Susan Mateo is charged with conspiracy to distribute controlled substances (heroin, fentanyl, and oxycodone) in violation of 21 U.S.C. §§ 841(a), 841(b)(1)(B), 841(b)(1)(C), and 846, distribution of controlled substances in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C), and a money laundering conspiracy in violation of 18 U.S.C. § 1956(h). (Doc. 75.)

Pending before the court is Defendant's motion to suppress statements made in a January 23, 2018 interview with two Drug Enforcement Agency ("DEA") agents. (Doc. 89.) The government opposes the motion. The court held an evidentiary hearing on April 19, 2019 at which Samantha Foss and DEA Agents Christopher Paquette and Brandon Hope testified. On May 10, 2019, the parties filed post-hearing memoranda, at which time the court took the pending motion under advisement.

Defendant is represented by Maryanne E. Kampmann, Esq. The government is represented by Assistant United States Attorneys Jonathan Ophardt and Spencer Willig.

**I.  Findings of Fact.**

The court incorporates its findings of fact set forth in its May 30, 2019 Opinion and Order Denying Defendant's Motion to Suppress Audio Recordings and Motion for a Bill of Particulars (Doc. 114) wherein it found, among other things, that in September 2017 through January 2018, the DEA and the Morristown Police Department entered into an agreement with a confidential information ("CI") to engage in a series of controlled

buys. Pursuant to that agreement, the CI voluntarily agreed to record her telephone conversations with and purchases from Defendant and her mother Esperanza "Hope" Delarosa in exchange for monetary compensation and consideration with regard to potential felony and misdemeanor charges.

On January 23, 2018, Defendant was arrested and transported to the Stowe Police Station where she was placed in a holding cell before being escorted to an interview room where she was seated at a table with DEA Diversion Investigator Christopher Paquette and DEA Task Force Officer ("TFO") Robert Sylvia. At the time of the interview, the DEA Agents were in possession of Defendant's cell phone which had been seized from her upon her arrest. The DEA Agents' interview with Defendant was audio and digitally recorded and is reflected in a stipulated transcript introduced into evidence as Gov't Ex. 3.

Prior to administering *Miranda* warnings, TFO Sylvia introduced himself and DEA Agent Paquette as follows:

> So my name is Rob, and this is Chris. We both work for the DEA, we're both Federal Agents for the DEA. Um, so I want to try to get this processed tonight, we have to do a couple of things. I told you, you're, you are not the only one that's being dealt with tonight, either here or elsewhere, including other states[.] . . . Okay. Including, they're doing a federal search warrant up at your house in Morrisville, at least that's here in Vermont, okay. So they're, they're dealing with the kids, they're going to be taken care of. There is two guys there, you know, we're going to treat them just like we treat you, with respect. But we're going to do our business and we'll go from there.

Gov't Ex. 3 at 1-2.

Defendant asked to speak to her children and was told that it was possible that arrangements could be made so that she could do so at the end of the night. When Defendant suggested her mother as a person who would be available to take care of her the children, TFO Sylvia responded as follows:

> Or if the guys there have something outlandish that's going to have to cause us to do something about it. They'll make arrangements, but, at, when we're done here, you'll know what's going to happen with them, or where they're going, or whether or not . . . I would have to talk to my big boss to

2

decide if you would be able to talk to them. Um, but I want to just make sure that we're clear about this, I don't want to hold, we're not holding that over your head. Whether you decide to talk with us, or we have a conversation, and what happens with your kids, I want to make sure that we keep that separate because I want you to talk to me, but I don't want you to think that you have to talk to me because it has anything to do with your kids tonight. We, we clear about that?

*Id.* at 2. Defendant nodded her assent. Thereafter, TFO Sylvia spoke to Defendant as follows:

Okay. I just want to make sure I'm not, we're not holding that over your head. That's not how we work, okay? So I've already told you we're federal agents and you have a federal arrest warrant for you. Meaning, what that means is a federal judge has listened to or read what we've learned about you, your mom, and some other folks, and agreed that we have enough to arrest you. And to search your house. And really the reason is, is because you guys are selling drugs. Now hold on to that for a second. So the judge has given us permission to arrest you and to search your place, and to do some other things elsewhere. That's a big deal because not everybody gets arrested by the DEA. Cause we're not the NYPD. We're not the State Police okay. We're talking, it's a very serious set of crimes that you're involved in. Um, what I also want to make clear, is the difference between the local police, and us. You know the NYPD or us, if you were to lie to us, if you were to lie to the NYPD you know, because you were drinking a beer on your door step, if you lie to them, it just hurts their feelings and they go home at the end of their shift. If you were to lie to us, it's actually a federal offense, okay. It's another crime, okay. It could be consider[ed] a crime when you lie to a federal agent, alright. Do you know Martha Stewart, the lady on TV? She went to federal prison, do you know why she went to federal prison? Because she lied to the FBI. So if basket weaving market Martha Stewart can go to jail, um, it's pretty reasonable to think that you know, when people lie to the government they could get in trouble for it. Does that make sense? Alright. So that's what, I just want to be fair. Because you have a chance to have a conversation with us. So we want to, we're going to get your fingerprints, we're going to ask you some information. Some of which we know, you know, your biographical, your height, your weight, where you live, what you do for work, those type of things. So we need to ask you those things, we want to talk to you. In order to do that we have to read you your rights. Have you ever had your rights read to you before?

*Id.* at 2-3.

3

Defendant responded that she had not previously been provided *Miranda* warnings and, in response to TFO Sylvia's questions, confirmed she had not been arrested previously, had not seen *Miranda* warnings provided on television, and did not know her *Miranda* rights. In response to TFO Sylvia's inquiry, Defendant indicated that she did not need her rights to be provided in Spanish and could understand them in English. At that point, the Agents and Defendant engaged in the following colloquy:

> TFO Sylvia: Okay, alright. So what I'm going to do is, I'm going to read through this form, I'm going to check a couple of boxes as I go. I'm going to ask you to look at it, I'm going to ask if you have any questions about it, because I want to talk to you. Does that, does that make any sense?
>
> Defendant: (Nods head yes).
>
> TFO Sylvia: Alright. So here's what we're going to do so we can get that stuff done. Um, you have the right to remain silent. You don't have to say anything. Anything you say could be used in the future court ([audio] cuts out) a lawyer before questioning. You have the right to have a lawyer with you during questioning. If you can't afford a lawyer, one will be appointed to represent you before any questioning, if you wish. And in this case it would need to be a lawyer that can represent you in federal court.[1] Okay? Do you understand that?
>
> Defendant: (Nods head yes).
>
> TFO Sylvia: Do you have any questions about any of it? Any of these things right here? Do you understand it clearly? Um, are you willing to answer some of the questions? Can we talk with you?
>
> Defendant: Can I talk to somebody?
>
> TFO Sylvia: I mean, are you talking like your kids, your mom, or . . .
>
> Defendant: Like a lawyer or something.
>
> TFO Sylvia: Do you wanna, okay. Do you wanna talk to a lawyer before you talk to us?
>
> Defendant: (Nods head yes).
>
> TFO Sylvia: Okay, fair enough. Time?
>
> DEA Agent Paquette: Nine-thirty.

---

[1] Defendant does not challenge the adequacy of the *Miranda* warnings provided to her. Accordingly, the court does not address that issue other than to note that there is no requirement that an attorney available for questioning also be able to represent the defendant in federal court.

4

> TFO Sylvia: Alright. What we're going to do is, at a minimum at least, I got to get your biographical information, okay?
>
> Defendant: (Nods head yes).
>
> TFO Sylvia: Um, so we'll go through that. Because you wanted to talk to a lawyer, I'm not going to ask any questions about some of the stuff we're interested in, unfortunately. But those are the rules, so we're not going to do that. But I am going to ask you just your biographical stuff, because we need to get that. And then what's going to happen tonight, once we're done getting your information, we're going to take your fingerprints. And from here, you're going to go up to Burlington. And, there you're going to go to the local jail up there in South Burlington.
>
> Defendant: Am I going to be able to (inaudible).
>
> TFO Sylvia: You're, you, you're going to jail tonight no matter what.
>
> DEA Agent Paquette: Yeah, I don't know if the, I don't know if the boss will allow that or not. That's something that, like Rob said, it um, on the onset of this, something we have to check with him on. If not, we're not one hundred percent sure.
>
> TFO Sylvia: And no offense, those are things you go[t] to think of when you get involved in this type of thing. Okay? That's, those are the things you got to think of. Um, so you're going to go to jail there tonight, overnight, with a federal arrest warrant. There is no bail. So you'll be held without bail, until the morning.

*Id.* at 4-6.

TFO Sylvia proceeded to describe to Defendant the proceedings that would take place the following morning at federal court. He then asked Defendant's name; date of birth; social security number; city of birth; U.S. citizenship; hair color; height; color of eyes; weight; whether she had birthmarks, piercing, or tattoos; her address; home and cell phone numbers; whether and where she was employed and in what position; and her employer's telephone number. He further inquired about her driver's license and passport and whether they would be found in her vehicle.

TFO Sylvia confirmed Defendant's mother's name and asked the names of each of her three siblings as well as their ages, where they lived, their dates of birth, and their telephone numbers. DEA Agent Paquette interrupted to ask if "[e]veryone just uses their cell phones?" *Id.* at 11. TFO Sylvia asked the ages of Defendant's children and the

5

identity of the men who were taking care of them at Defendant's home. Defendant identified the men as her brother and the children's father and asked whether the children could stay with their father. TFO Sylvia responded as follows:

> TFO Sylvia: As I know right now, yes. But I don't know what he, if he's done anything. What they found there, the circumstances. So I'm, you know, I don't want to lie to you.
>
> Defendant: He's never lived there.
>
> TFO Sylvia: Well, then, but he's their father, so. I just, it doesn't matter. You know, whatever is there could, he could be responsible for that. I don't know what he did, when they arrived there. So . . .

*Id.* at 12.

The DEA Agents asked Defendant her gang affiliation, whether she had any injuries, any prior or current psychiatric problems, and whether she had made any threats or attempts at suicide. When Defendant admitted that she had a prior threat or attempt at suicide, the DEA Agents asked her when that happened; what it consisted of; whether she had suicidal thoughts presently; whether she took any prescribed medications; whether she used alcohol; and twice whether she used narcotics.

Although Defendant initially denied using alcohol, she subsequently admitted that she drank wine and beer. She was asked if she was only an occasional and social drinker and confirmed that she was. She was told that she would be required to be submit to a urine test on the following day at court. When she stated that she had "never done drugs[,]" TFO Sylvia asked: "Not even marijuana?" *Id.* at 15. The DEA Agents then asked for an emergency contact, suggested one of her brothers for this purpose, asked for his phone number, asked if she could obtain the phone number for her brother from her cell phone, and asked if she would provide the password or her fingerprint for her cell phone. In doing so, TFO Sylvia advised her that they would need her consent to search her cell phone.

At the conclusion of the interview, TFO Sylvia and Defendant engaged in the following colloquy:

> TFO Sylvia: Now one of the things that, when we're going to take you up to the jail, they're going to ask us. Do you have any drugs on you or in you?
>
> Defendant: (Shakes head no) No I don't.
>
> TFO Sylvia: Nothing like that? Because that's a separate crime, if you go bring drugs into the jail.
>
> Defendant: (Inaudible).
>
> TFO Sylvia: Alright.

*Id.* at 17.

At the court's hearing, DEA Agent Paquette testified that the DEA uses a booking form to elicit information from suspects who are processed for federal charges and that "anytime a federal defendant is arrested or processed, we're required to fill this form out and fax it to the marshals' office." (Doc. 109 at 88, lines 17-19.) It is not clear, however, at what point during Defendant's questioning a booking form was used. DEA Agent Paquette was not certain whether he had a booking form with him during Defendant's interview. *See id.* at 66, lines 23-25 ("I don't specifically recall when I filled [the USMS] form out. Sometime prior to faxing it over to the U.S. Marshals Service."). The "Arrest and Booking Information Sheet[,]" provided by the U.S. Marshals Service (the "USMS form"), states that it "must be completed for all new arrests prior to acceptance of prisoner into cellblock." USMS Form, Gov't Ex. 4. It cautions that the arrestee will remain the custodial and financial responsibility of the arresting agency even if held in the USMS cellblock until remanded to USMS custody by a judicial officer. The USMS form seeks to elicit the following information:

> Name, DOB, POB
> Sex, Race, Height, Hair Color, Eye Color
> SSN, FBI #, D/L #, Alien #
> Home Address, City, State, Zip
> Phone #
> Occupation, Employer, Work Phone #
> Employer Address, City, State, Zip
> Scars/Marks/Tattoos
> Alias(es)
> Gang Affiliation, Member, Associate

Separatee Issues (explain)
Complaint or Evidence of Illness/Injury: Yes, No, Treated, Refused Treatment
Prior or Current Psychiatric Problems (explain)
Suicide Threats or Attempts (If yes, please explain)
Prescribed Medications Yes, No, Medications Used
Alcohol/Narcotic User Yes, No, Drugs Used

**Emergency Contact Information**
Nearest Relative's Name, Relationship
DOB, Phone Number
Address, City, State, Zip

**Federal Charges** (Actual wording of Statute, to include specific narcotic, weapon, type of assault, etc.)
Warrant #, Date of Warrant
Other Agency Holds/Detainers

**DNA Sample information** (federal agents are required to obtain a DNA sample utilizing standardized collection kits)
Collecting Agent's Name
DNA Kit Number

**Arrest Information**
Arresting Agency
Agent's Name, Agent Contact # (Pager/Cellular & Office)
Arrest Date/Time, Arrest Location

**If the arrestee was booked into any jail prior to appearing at the USMS Cellblock, you must provide:**
Name of Jail, Booking Date/Time

*Id.*

DEA Agent Paquette testified that he typically uses a DEA Personal History Report, Gov't Ex. 5, to solicit and record booking information. Among other things, the DEA Personal History Report seeks an arrestee's: "Family Information[,]" "Source of Supply[,]" "Criminal Associates[,]" and information regarding types and classifications of "Criminal Organization[s.]" *Id.*

In response to DEA Agent Paquette's testimony that he needed family information from Defendant "[t]o properly complete the DEA personal history form" (Doc. 109 at 85, line 20), the court inquired as follows:

8

> The court: So let me ask you, why do you need to know who her siblings are and where they live in order to book her?
>
> DEA Agent Paquette: It's a -- it's part of the DEA personal history report.
>
> The court: So other than the form, is there any booking purpose to that?
>
> DEA Agent Paquette: Not that I can think of.

*Id.* at 85-86, lines 21-25; 1-2.

DEA Agent Paquette further conceded that when TFO Sylvia asked Defendant for her cell phone number, they had seized her cell phone as evidence and understood that her cell phone number was relevant to their investigation:

> Defense Counsel: You knew that her phone number was relevant to the drug investigation, correct?
>
> DEA Agent Paquette: Correct. We already had the telephone number.
>
> Defense Counsel: But you didn't have it out of her mouth what the phone number was, did you?
>
> DEA Agent Paquette: Prior to this interview?
>
> Defense Counsel: Correct.
>
> DEA Agent Paquette: Correct.

*Id.* at 83, lines 1-8.

Defendant contends that the DEA Agents engaged in custodial interrogation without first administering *Miranda* warnings, failed to honor her invocation of counsel, and exploited the booking exception to *Miranda* to obtain investigatory information. She asks that all of her statements made in the course of the January 23, 2018 interview be suppressed.

The government responds that before Defendant was questioned, she was provided with *Miranda* warnings and, once she invoked her right to counsel, the only questions she was asked were standard pedigree questions necessary to process her for a federal offense.

9

## II. Conclusions of Law and Analysis.

### A. Whether the Agents Engaged in Custodial Interrogation Without *Miranda* Warnings.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. In order to protect this right, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The "functional equivalent" includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301 (footnote omitted). This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*

Law enforcement may violate *Miranda* by statements as well as direct questioning. *See id.* at 298-99 ("[R]eferences . . . to questioning might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody. We do not, however, construe the *Miranda* opinion so narrowly.") (internal quotation marks omitted); *United States v. Rosario-Cintron*, 194 F. Supp. 3d 161, 170 (D.P.R. 2016) (observing that a court "should not simply dismiss all statements made by the police that do not end in a question mark"). However, "[b]riefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation." *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir. 1995). For this reason, "courts have generally rejected claims[] . . . that disclosure of . . . inculpatory evidence possessed by the police, without more, constitutes 'interrogation[.]'" *Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009); *see also*

*Easley v. Frey*, 433 F.3d 969, 974 (7th Cir. 2006) (holding that police officer's "matter-of-fact communication of the evidence against [the defendant] and the potential punishment he faced" did not constitute interrogation). Because of the potential for eliciting an inculpatory or exculpatory response, "this practice has the potential to constitute custodial interrogation if it ventures too far." *United States v. Battle*, 2013 WL 5769982, at *12 n.7 (D. Vt. Oct. 24, 2013); *see also Toliver v. Gathright*, 501 F. Supp. 148, 153 (E.D. Va. 1980) (observing that "all of the circumstances point toward the conclusion that . . . informing [a suspect] of [a] statement implicating him was likely to prompt petitioner to incriminate himself").[2] When that happens, *Miranda* warnings are "an absolute prerequisite[.]" *Miranda*, 384 U.S. at 471.

Prior to administering *Miranda* warnings, TFO Sylvia made the following statements and asked the following questions:

> . . . So I've already told you we're federal agents and you have a federal arrest warrant for you. Meaning, what that means is a federal judge has listened to or read what we've learned about you, your mom, and some other folks, and agreed that we have enough to arrest you. And to search your house. And really the reason is, is because you guys are selling drugs. Now hold on to that for a second. So the judge has given us permission to arrest you and to search your place, and to do some other things elsewhere. That's a big deal because not everybody gets arrested by the DEA. Cause we're not the NYPD. We're not the State Police okay. We're talking, it's a very serious set of crimes that you're involved in. . . . Have you ever had your rights read to you before? . . . Never? Never been arrested before? . . . Never been read your rights by the police or anything?

---

[2] *Cf. Caputo v. Nelson*, 455 F.3d 45, 50-51 (1st Cir. 2006) (noting that "[s]ince *Innis*, a number of courts have considered whether police may confront a suspect with evidence against him without engaging in the functional equivalent of interrogation" and noting a brief statement that law enforcement "possessed inculpatory evidence[,]" providing "results of [an] investigation to a suspect who had herself asked the officer to let her know such results[,]" and identifying the victim to the suspect and "briefly stat[ing] the evidence against him" have all been held insufficient to constitute custodial interrogation); *with United States v. Szymaniak*, 934 F.2d 434, 437 (2d Cir. 1991) (holding that custodial interrogation occurred where officer visited defendant "[t]hree or four times" to confront him with inculpatory information and "request[ed] that he give [the police] a statement") (emphasis omitted).

11

Gov't Ex. 3 at 3-4. In this "preamble," TFO Sylvia did not caution Defendant not to speak until she had been advised of her *Miranda* rights or advise her that any statements she made could be used against her. He not only confronted Defendant with the evidence against her, he expressed a firm conviction in her guilt and suggested that conviction may be shared by the federal judge who authorized her arrest and a search of her home.[3] In response, Defendant made a number of statements, albeit not significantly incriminatory, prior to receiving *Miranda* warnings.

The Second Circuit has opined that there is generally no legitimate reason beyond officer and public safety to engage in custodial interrogation without *Miranda* warnings:

> [W]e agree with the *Williams* Court in its observation that "[o]nce a law enforcement officer has detained a subject *and subjects him to interrogation* . . . there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason . . . is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness."

*United States v. Capers*, 627 F.3d 470, 480-81 (2d Cir. 2010) (quoting *United States v. Williams*, 435 F.3d 1148, 1159 (9th Cir. 2006)).

Because prior to administering *Miranda* warnings, TFO Sylvia's statements to Defendant were "reasonably likely to elicit an incriminating response[,]" *Innis*, 446 U.S. at 301, *Miranda* warnings were required and all of Defendant's pre-*Miranda* statements must be suppressed.

### B. Whether the DEA Agents Honored Defendant's Invocation of the Right to Counsel.

While the government concedes that Defendant was in custody and unequivocally invoked her right to counsel, it contends that after her invocation, the DEA Agents asked her only routine booking questions in order to process her arrest. *Miranda* warnings are not required for "routine" questions designed to elicit "biographical data necessary to

---

[3] *See, e.g.*, Gov't Ex. 3 at 2-3 ("[A] federal judge has listened to or read what we've learned about you[] [and] your mom, . . . and agreed that we have enough to arrest you. And to search your house. And really the reason is, is because you guys are selling drugs. . . . So the judge has given us permission to arrest you and to search your place, and to do some other things elsewhere."); ("We're talking, it's a very serious set of crimes that you're involved in.").

12

complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (internal quotation marks omitted). The booking exception applies "whether that solicitation [of information concerning a person's identity and background] occurs before, or after, *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (citations omitted). In *Rosa v. McCray*, the Second Circuit held that *Muniz* permits questions that "appear reasonably related to the police's administrative concerns" and that "[w]hether the information gathered turns out to be incriminating in some respect does not, by itself, alter the general rule that pedigree questioning does not fall under the strictures of *Miranda*." 396 F.3d 210, 221 (2d Cir. 2005) (internal quotation marks omitted).

Only a handful of cases have addressed the interplay of an invocation of the right to counsel and the *Muniz* booking exception. If a suspect invokes her right to counsel, "the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474.[4] In *Edwards v. Arizona*, the Supreme Court reaffirmed this holding:

> [T]he Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
>
> *Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, the interrogation must cease until an attorney is present. Our later cases have not abandoned that view. In *Michigan v. Mosley*, the Court noted that *Miranda* had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that

---

[4] Courts have recognized that a lawyer may not be immediately available. In that event, the Supreme Court has required law enforcement to wait before questioning a suspect who has invoked his or her right to counsel until a lawyer is present unless the suspect initiates a further exchange for which new *Miranda* warnings are provided and a valid waiver is obtained. *See Duckworth v. Eagan*, 492 U.S. 195, 204 (1989).

13

interrogation cease until an attorney was present only if the individual stated that he wanted counsel. In *Fare v. Michael C.*, the Court referred to *Miranda*'s rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease. And just last Term, in a case where a suspect in custody had invoked his *Miranda* right to counsel, the Court again referred to the undisputed right under *Miranda* to remain silent and to be free of interrogation until he had consulted with a lawyer. We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel.

*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (footnote, citations, and internal quotation marks omitted).

At first glance, an invocation of the right to counsel would preclude even booking questions. However, in *Rhode Island v. Innis*, the Court held that questions "normally attendant to arrest and custody" are not within the definition of "interrogation." 446 U.S. at 301. Accordingly, even if a suspect has invoked her right to counsel, law enforcement may still ask pedigree questions provided those questions fall squarely within *Muniz*'s booking exception. In such circumstances, however, law enforcement must tread with caution. In authoring the plurality opinion in *Muniz*, Justice Brennan warned that "[r]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Muniz*, 496 U.S. at 602 n.14 (internal quotation marks omitted).[5]

---

[5] *Compare United States v. Stewart*, 770 F. Supp. 872, 879 (S.D.N.Y. 1991) (holding that although defendant "clearly invoked his right to counsel" the questions subsequently asked by the law enforcement agent were "questions concerning pedigree" which are "normally attendant to custody, and therefore do not constitute interrogation."), *with People v. Antonio*, 446 N.Y.S.2d 96, 98 (N.Y. App. Div. 1982) (holding that after defendant "effectively invoked his right to counsel" the police "violated defendant's rights when they resumed questioning him shortly thereafter" because "[t]he questions asked of defendant were clearly not those aimed at ascertaining pedigree since they went to the very heart of the crime charged.").

Here, after Defendant's invocation of counsel, the DEA Agents suggested that they "had" to ask Defendant certain biographical questions and further implied that she "had" to answer them. *See* Gov't Ex. 3 at 5 ("What we're going to do is, at a minimum at least, I got to get your biographical information, okay?"); *id.* at 6 ("Because you wanted to talk to a lawyer, I'm not going to ask any questions about some of the stuff we're interested in, unfortunately. But those are the rules, so we're not going to do that. But I am going to ask you just your biographical stuff, because we need to get that."). Based upon a lengthy investigation and numerous controlled buys, it is questionable whether the DEA Agents needed to ask any of the questions that followed in order to process Defendant for a federal offense.[6] Moreover, contrary to their suggestion, Defendant had no obligation to answer their pedigree questions. *See United States v. Montana*, 958 F.2d 516, 518-19 (2d Cir. 1992) ("If a suspect refuses to answer even non-incriminating pedigree questions, the interrogating officer cannot reasonably conclude that he will immediately thereafter consent to answer incriminating ones" and thus law enforcement should treat this "silence as an invocation of [the suspect's] Fifth Amendment privilege" as questioning thereafter "violated [the suspect's] right to cut off questioning in violation of *Michigan v. Mosley*, 423 U.S. 96, 103-04 [] (1975).").

In this case, the DEA Agents asked Defendant not only routine booking questions, but questions well beyond any booking exception. For example, questions regarding Defendant's siblings' names, addresses, dates of birth, and phone numbers; whether her siblings used only cell phones; the identity of the men who were at her home while it was being searched; repeated questions regarding whether Defendant used drugs and drank alcohol; a request for the PIN code on her phone; and whether she had drugs in or on her person were all likely to elicit incriminating responses and were not needed for any administrative purpose. To the extent the government suggests that if a question can be found on a standardized booking form, it may be deemed to fall within the booking

---

[6] *See* Opinion and Order Denying Defendant's Motion to Suppress Audio Recordings and Motion for Bill of Particulars (Doc. 114 at 7, 10) (describing the five-month investigation and over ten controlled buys law enforcement conducted prior to Defendant's arrest).

15

exception, no court has gone that far. *See Rosa*, 396 F.3d at 222 (considering whether pedigree questions were "narrowly crafted . . . to obtain information necessary to complete the booking form"); *United States v. Cantoni*, 2019 WL 1264899, at *2-3 (E.D.N.Y. Mar. 19, 2019) (observing that law enforcement had no reason to know that asking for defendant's phone number would produce an inculpatory response and holding question fell within the booking exception because, among other things, the phone number "was recorded on a standard USM-132 intake form routinely used by the United States Marshals Service").[7] Indeed, if that approach were adopted in this case, the DEA Personal History Report would authorize booking questions regarding not only Defendant's family members, but her "Source of Supply[,]" "Criminal Associates[,]" and "Criminal Organization[.]" Gov't Ex. 5 at 2. As a result, while relevant, the presence of a question on a standardized form is hardly dispositive. In any event, in this case, the DEA Agents asked Defendant questions that were not present on any booking form.

Although the focus is "primarily upon the perceptions of the suspect, rather than the intent of the police[,]" *Innis*, 446 U.S. at 301, the intent of law enforcement is not irrelevant. As the Second Circuit has explained:

> To determine whether the police abused the gathering of pedigree information in a manner that compels *Miranda* protection requires an objective inquiry: Should the police have known that asking the pedigree

---

[7] In *United States v. Brown*, Case No. 2:17-cr-00084, Doc. 66, at 5 n.4 (D. Vt. July 25, 2018), this court raised concerns regarding using the U.S. Marshal's Prisoner Personal History form to solicit information beyond the limited *Muniz* booking exception:

> Law enforcement's questioning while completing the USMS Prisoner Personal History form arguably went beyond mere routine booking questions. Courts have recognized a "routine booking question" exception which exempts from *Miranda*'s coverage "questions to secure the biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (plurality) (internal quotation marks omitted); *see also United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) (finding questions not "intended . . . to elicit a confession or incriminating information[,]" but instead meant to gather the "sort of basic information needed to facilitate the booking and arraigning of a suspect" do not violate *Miranda*). Here, law enforcement asked Defendant about her drug use, her phone number (which was the number she used to communicate with the CI), the address of her mother (who was a known drug user), and where Defendant had spent the night.

16

questions would elicit incriminating information? *See Innis*, 446 U.S. at 302[] ("[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response" (emphasis in original)); *cf. United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983) ("The test is objective. The subjective intent of the agent is relevant but not conclusive.").

*Rosa*, 396 F.3d at 222. In a recent Summary Order, the Second Circuit articulated a three-part test to make this determination:

> In applying *Muniz*, we have explained that an officer cannot ask a pedigree question, even if it otherwise might fall within the booking exception, if she knows or should have known the question was reasonably likely to elicit an incriminating response. *See Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir. 2005); *see also United States v. Williams*, 842 F.3d 1143, 1146-47 (9th Cir. 2016) ("The booking questions exception . . . is subject to an important qualification: When a police officer has reason to know that a suspect's answer may incriminate him . . . even routine questioning may amount to interrogation." (internal quotation marks omitted)).
>
> Thus, the booking exception to *Miranda* applies only when three elements are satisfied: (1) the question asked by law enforcement seeks biographical data necessary to complete booking or pretrial services, (2) appear[s] reasonably related to the police's administrative concerns, *and* (3) the question is not likely to elicit an incriminating response. *Rosa*, 396 F.3d at 221.

*United States v. Durand*, 2019 WL 1646312, at *3 (2d Cir. Apr. 15, 2019), *as amended* (Apr. 16, 2019) (internal quotation marks omitted).

In the instant case, the DEA Agents reasonably should have known that some of their questions were either not pedigree questions, or were impermissible pedigree questions in light of Defendant's invocation of her right to counsel. Questions regarding Defendant's family members, the identity of the men at her home, the PIN code to her cell phone, her gang affiliation, and her use and possession of drugs all fail *Durand*'s three-prong test as those questions were not necessary to complete booking or pretrial services, did not pertain to legitimate administrative concerns, and were likely to elicit an incriminating response. As a result, Defendant's responses to those questions must be suppressed.

17

The solicitation of Defendant's cell phone number presents a closer question because some district courts in the Second Circuit have held that a phone number, even if incriminatory, falls within the *Muniz* exception. *See Cantoni*, 2019 WL 1264899, at *2 (collecting cases). In *Durand*, however, the Second Circuit required a more searching inquiry:

> [because the defendant has] sufficiently demonstrated . . . that the postal inspectors were investigating the mail and identity fraud crimes for months and that the inspectors knew before his interview a small number of phone numbers were critical to their investigation . . . [he] at least alleged a sufficient basis to raise the evidentiary issue of whether the inspectors' questions about his phone number were reasonably likely to elicit incriminating information, and thus violated the Fifth Amendment.

2019 WL 1646312, at *4 (citing *Williams*, 842 F.3d at 1147) (finding that the booking exception does not apply where the police suspect an individual of a crime and ask a biographical question likely to confirm or deny that suspicion).

Because the DEA Agents were well aware of Defendant's cell phone number, they had no need to ask her for it in order to process her for a federal crime. Because they had seized her cell phone as evidence, they had no intention to use her cell phone number to contact her. There was thus no legitimate administrative concern that rendered Defendant's cell phone number part of the booking process. More importantly, the DEA Agents knew that asking Defendant to provide her cell phone number in a recorded interview would likely draw a direct connection in Defendant's own words between herself and a key piece of incriminating evidence. Solicitation of Defendant's cell phone number was thus useful for investigative purposes but served no other purpose. As a result, the solicitation of Defendant's cell phone number fell outside the *Muniz* booking exception and Defendant's recitation of it must be suppressed. *See United States v. Scott*, 270 F.3d 30, 43 n.8 (1st Cir. 2001) (noting that even questions regarding a suspect's age and place of residence may be outside the booking exception where officers "knew full well that answers from [the suspect] about his age and place of residence" would likely to be incriminating evidence of an intent to defraud).

Defendant's post-*Miranda* statements regarding her name, address, identifying characteristics, employer, occupation, and physical and mental condition were all within the *Muniz* booking exception in the facts and circumstances of this case. Consequently, to the extent Defendants seeks suppression those statements, her motion is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's motion to suppress statements (Doc. 89) is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 10th day of June, 2019.

Christina Reiss, District Judge
United States District Court